STATE OF NORTH CAROLINA v. GEORGE LESANE

No. COA99-262

(Filed 4 April 2000)

**1. Evidence— hearsay—not truth of matter asserted**

The trial court did not err in a first-degree murder case by admitting the testimony of the victim's mother concerning what her daughter told her about her problems with defendant, the daughter's ex-boyfriend, and about her request to have someone pick her up at the bus stop, because these statements are not hearsay since they are offered to explain why the victim's mother asked the victim-brother to meet his sister at the bus stop that afternoon, which is a purpose other than for proving the truth of the matter asserted.

**2. Evidence— hearsay—state of mind exception—subsequent conduct**

The trial court did not err in a first-degree murder case by admitting the testimony of a detective concerning defendant's family not knowing his whereabouts because these statements are not hearsay since they were offered to show the effect the statements had on the testifying witness's state of mind and to explain his subsequent conduct in calling other non-family members to help him try to locate defendant, which is a purpose other than for proving the truth of the matter asserted.

**3. Evidence— hearsay—erroneous admission—no prejudicial error**

Although the trial court erred in a first-degree murder case by admitting the hearsay testimony of the victim's wife concerning the victim telling her that defendant previously stabbed someone seventeen times, the error was not prejudicial in light of the abundance of evidence implicating defendant, including witnesses who actually saw defendant shoot the victim.

**4. Evidence— redirect examination—permissible scope—opened the door—dispel favorable inferences**

The trial court did not err in concluding the prosecutor did not exceed the permissible scope of redirect examination of a witness in a first-degree murder case by asking questions concerning defendant's financial support of his child because defendant opened the door to this evidence since: (1) the State has the right to introduce otherwise irrelevant evidence if it tends to dispel favorable inferences arising from defendant's cross-examination of a witness; and (2) defendant elicited testimony during cross-examination of this witness to the effect that defendant had regular visitation with his child in an attempt to raise a favorable inference that defendant was a good father.

**5. Evidence— direct examination—leading questions—refreshing recollection or memory**

The trial court did not abuse its discretion in a first-degree murder case by allowing the prosecutor to ask a leading question during direct examination in order to elicit testimony that defendant spat on the victim immediately after shooting him because leading questions are permissible if the examiner seeks to aid the witness' recollection or refresh her memory when the witness has exhausted her memory without stating the particular matter required. N.C.G.S. § 8C-1, Rule 611(c).

**6. Evidence— lay opinion—shorthand statement of fact**

The trial court did not err in a first-degree murder case by allowing the testimony of an eyewitness, stating it looked to him like defendant was trying to shoot the victim in the head, because the statement was a permissible opinion in the form of a shorthand statement of fact. N.C.G.S. § 8C-1, Rule 701.

STATE v. LESANE

[137 N.C. App. 234 (2000)]

**7. Criminal Law— motion for appropriate relief—mistake of law—parole eligibility—no prejudice**

The trial court did not err in a first-degree murder case by denying defendant's post-trial motion for appropriate relief based on an alleged mistake of law with respect to eligibility for parole because there was no prejudice since defendant has not suggested the mistake of law had any effect on his plea discussions or decision not to take a plea, and contrary to defendant's assertions, there is no logical relation between a mistaken understanding of eligibility for parole and the decision to argue imperfect self-defense.

**8. Constitutional Law— effective assistance of counsel—misreading of statute—trial strategy**

The trial court did not err in a first-degree murder case by concluding defendant was not denied effective assistance of counsel, based on the allegations that defense counsel mistakenly misunderstood the applicable punishment for first-degree murder and the failure to develop a defense of imperfect self-defense, because: (1) the fact that both the district attorney and the trial judge also misread the statute concerning parole eligibility demonstrates that defense counsel's errors were not constitutionally deficient; and (2) a tactical decision that is part of trial strategy is generally not second-guessed by our courts, and the evidence reveals the victim was unarmed and had his back turned at the time defendant shot him.

Appeal by defendant from judgment entered 4 February 1998 by Judge A. Leon Stanback, Jr. in Robeson County Superior Court. Heard in the Court of Appeals 25 January 2000.

*Attorney General Michael F. Easley, by Assistant Attorney General H. Dean Bowman, for the State.*

*Bowen & Berry, PLLC, by Sue A. Berry, for defendant-appellant.*

LEWIS, Judge.

Defendant was tried at the 2 February 1998 Session of Robeson County Superior Court for the first-degree murder of Larry McCormick on 1 December 1994. The jury returned a verdict of guilty on 4 February 1998, and defendant now appeals.

At trial, the State's evidence tended to show that on 1 December 1994, Larry McCormick went to a bus stop to pick up his sister, Tammy McCormick ("Tammy"), from school. Tammy had recently ended her relationship with defendant and knew defendant would be at the bus stop that afternoon to confront her. When Mr. McCormick arrived at the bus stop, he and defendant began arguing. After the school bus arrived, defendant pulled out a gun and shot Mr. McCormick several times. Defendant then rode away on his bicycle.

[1] Defendant begins by arguing that the trial court erroneously admitted several pieces of hearsay evidence. The first evidence to which defendant objects is certain testimony by Aldrena McCormick, the victim's mother. Specifically, Ms. McCormick testified as follows:

Q: Now, when [defendant and Tammy] started having trouble, how long was that before Larry was killed; do you know?

A: Well, I didn't know just when they had start having trouble, but my—my daughter told me sometime afterwards.

[Objection; overruled.]

. . . .

Q: Why was it that you asked your son to go get—

[Objection; overruled.]

A: That morning I walked [Tammy] to the bus stop. She hadn't said anything to me about anything until she got ready to go— the bus came up and she told me—

[Objection; overruled.]

A: She told me that—would I have someone come to the bus stop when she get out—

[Move to strike.]

A: — out of school.

[Denied.]

Q: Go ahead.

A: When she get out of school. I asked her why. And she told me because—

[Objection; overruled.]

A:  She asked me—would I have someone come to the bus stop. I asked her why. She said because [defendant] said he would be there when she got off the bus, and that he—she was—he—she was going with him. So I said okay. So the bus came, she got on, and she left.

(Tr. at 25-27.) Defendant contends that Ms. McCormick's testimony with respect to what Tammy told her, both as to her problems with defendant and her request that someone pick her up at the bus stop, constituted inadmissible hearsay. Because we conclude that these statements were not hearsay in the first place, we disagree.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.R. Evid. 801(c). If a statement is offered for any purpose other than for proving the truth of the matter asserted, it is not objectionable as being hearsay. 2 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 195 (5th ed. 1998). For example, a statement introduced for the purpose of explaining the subsequent conduct of the testifying witness is not hearsay. *State v. Morton*, 336 N.C. 381, 399, 445 S.E.2d 1, 11 (1994). The statements here with respect to Tammy's problems with defendant and her request that someone meet her at the bus stop were introduced to explain why Ms. McCormick did in fact ask Mr. McCormick to meet Tammy at the bus stop that afternoon. Accordingly, Ms. McCormick's testimony was properly admitted.

[2] The next evidence to which defendant objects is the testimony of Detective Downing, who testified as follows:

Q:  You, personally, went to New York to retrieve the Defendant?

A:  I did.

[Objection—leading; overruled.]

Q:  And did you retrieve him?

A:  I did.

. . . .

Q:  In your attempt to locate him, did you talk to his family?

A:  I did.

Q: Did they indicate to you that they knew where he was?

[Objection; overruled.]

Q: Tell us whether or not they indicated to you that they knew where the Defendant was?

A: They admitted they did not know where he was.

(Tr. at 201-02.) Defendant again argues that this testimony as to his family's lack of knowledge of his whereabouts constitutes inadmissible hearsay that tended to suggest defendant had fled the state. For the same reasons that we articulated earlier, we disagree. This testimony was not offered to prove the truth of the matter asserted; whether or not defendant's family actually knew his whereabouts was immaterial. Instead, this testimony was introduced to show the effect it had on the testifying witness' state of mind and also helped explain his subsequent conduct in calling other non-family members to help him try to locate defendant. *See generally State v. Irick*, 291 N.C. 480, 498, 231 S.E.2d 833, 845 (1977) (allowing evidence of police dispatches in order to explain the officers' subsequent conduct in pursuing a suspect).

[3] Finally, defendant contests the admission of certain testimony by Donna McCormick, the victim's wife, as to what Mr. McCormick purportedly told her before he left to pick up his sister at the bus stop. Specifically, Ms. McCormick testified:

A: And, at that time [immediately before he left for the bus stop], he had an expression on his face. He acted like he didn't want to go.

[Objection; overruled.]

A: And then he told his mother I'm on my—I'm on my way. After he hung up the phone, he was like, Renee—he told me I know [defendant] has stabbed—

[Objection; overruled.]

A: —this guy seventeen times. He told me I don't have no weapons.

[Objection; overruled.]

A: So he got ready to walk out the door.

(Tr. at 195.) The State maintains that this testimony was admissible under the "then existing state of mind" exception to the hearsay rule. We disagree with the State's argument but conclude that the error resulted in no prejudice to defendant.

Rule 803(3) allows hearsay testimony if the testimony is in the form of a statement as to the declarant's then existing state of mind or emotions; the rule excludes the testimony, however, if it is purely a recitation of facts. N.C.R. Evid. 803(3). The rationale for Rule 803(3) has been explained as follows:

> "[T]here is a fair necessity, for lack of other better evidence, for resorting to a person's own contemporary statements of his mental or physical condition" and that such statements are more trustworthy than the declarant's in-court testimony. Mere statements of fact, however, are provable by other means and they are not inherently trustworthy.

*State v. Hardy*, 339 N.C. 207, 229, 451 S.E.2d 600, 612 (1994) (quoting 6 John H. Wigmore, *Evidence* § 1714 (1976)). Statements of emotion include, for example, "I'm frightened" or "I'm angry." *Id.* Our courts have further clarified that testimony that recites both emotions and facts falls within the scope of the 803(3) exception. *State v. Marecek*, 130 N.C. App. 303, 306, 502 S.E.2d 634, 636, *disc. review denied*, 349 N.C. 532, 526 S.E.2d 473 (1998). This is because "factual circumstances surrounding [the declarant's] statements of emotion serve only to demonstrate the basis for the emotions." *State v. Gray*, 347 N.C. 143, 173, 491 S.E.2d 538, 550 (1997), *cert. denied*, 523 U.S. 1031, 140 L. Ed. 2d 486 (1998). Thus, to synthesize, our courts have created a sort of trichotomy in applying Rule 803(3). Statements that recite only emotions are admissible under the exception; statements that recite emotions and the facts underlying those emotions are likewise admissible; but statements that merely recite facts do not fall within the exception.

In this case, Ms. McCormick testified that her husband said, "I know [defendant] has stabbed this guy seventeen times." This testimony, no doubt, is a recitation of facts. This testimony also ostensibly is a basis for Mr. McCormick's fear of going to meet Tammy at the bus stop, given that he knew defendant would be there. Significantly, however, we have no actual statement of emotion by Mr. McCormick. All we have is Ms. McCormick's opinion testimony that her husband acted frightened. Absent an actual statement of emotion, any statement of fact that could purportedly serve as a basis for this emotion

is outside the scope of Rule 803(3). Were we to allow this statement of fact merely because Ms. McCormick opined that her husband looked afraid, we would be opening the door for the admission of any statement of fact so long as the testifying witness could attribute some emotion or state of mind to the declarant that could be supported by that statement of fact. The hearsay rule would be eviscerated as a result. *Compare Gray*, 347 N.C. at 173, 491 S.E.2d at 550 (allowing statements of prior abuse to explain the basis for declarant's statement that she was afraid) *with Marecek*, 130 N.C. App. at 306, 502 S.E.2d at 636 (disallowing declarant's recitation of facts in the absence of an actual statement of emotion). Accordingly, we hold that Ms. McCormick's testimony with respect to defendant having previously stabbed someone seventeen times was inadmissible hearsay.

Nonetheless, we conclude that the error resulted in no prejudice to defendant. To receive a new trial, defendant must show "a reasonable probability that, had the error in question not been committed, a different result would have been reached at the trial." N.C. Gen. Stat. § 15A-1443(a) (1999). There was an abundance of testimony here that implicated defendant, many of it by witnesses who actually saw defendant shoot Mr. McCormick. We do not see how one isolated statement that defendant had previously stabbed someone seventeen times was so prejudicial to defendant that its exclusion would have probably led to a different result at trial.

**[4]** In his next assignment of error, defendant argues that the prosecutor exceeded the permissible scope of examination in his re-direct of Aldrena McCormick. Specifically, defendant objects to the following line of questioning:

Q: Did [defendant] support [his] child?

A: He would buy him, you know, things. He would buy him clothes and get his haircut and things like that. He didn't never give—he might have gave her some money straight out, but, as far as I know, I—you know—

Q: Do you know where he—

A: —but it wasn't—

Q: Do you know where he was working at the time?

[Objection; overruled.]

A: As far as I know, he wasn't.

Q: During—during the entire time that he was going with your daughter, was he working then?

[Objection; overruled.]

A: As far as I know, he wasn't.

(Tr. at 58-59.) Defendant contends that any evidence with respect to the support of his child was irrelevant. However, the State has the right to introduce otherwise irrelevant evidence if it tends "to dispel favorable inferences arising from defendant's cross-examination of a witness." *State v. Johnston*, 344 N.C. 596, 605-06, 476 S.E.2d 289, 294 (1996). Here, in cross-examining Ms. McCormick, defendant elicited testimony to the effect that defendant had regular visitation with his child. This evidence with respect to visitation tended to create an inference favorable to defendant, namely that he was a good father. In doing so, defendant thereby opened the door for the State to dispel this inference on re-direct by suggesting that, because he did not contribute much financial support to his child, defendant was not so good a father after all.

[5] Next, defendant argues that the prosecutor impermissibly asked a leading question in order to elicit testimony that defendant spat on Mr. McCormick immediately after shooting him. In examining Gayle Mitchell, a passenger on the bus and eyewitness to the shooting, the prosecutor asked the following questions:

Q: Okay. What, if anything, else did you see [defendant] do?

A: After he shot him, he got on his bicycle and he rode away.

Q: Did he do anything else?

A: (Shakes head from side to side.)

Q: Did you see him spit?

[Objection; overruled.]

Q: Tell us—tell us whether or not you saw him spit.

A: Yeah, I seen him spit.

Q: Who did you see spit?

A: [Defendant].

. . . .

Q: Where—where was he when he spat?

A: He was over [Mr. McCormick] when he spit.

(Tr. at 118-19.) We conclude that the prosecutor's leading question was permissible in the present situation.

Generally, our rules of evidence proscribe the use of leading questions on direct examination. N.C.R. Evid. 611(c). However, our Supreme Court has stated that leading questions are permissible in certain situations, one of which is if "the examiner seeks to aid the witness' recollection or refresh [her] memory when the witness has exhausted [her] memory without stating the particular matters required." *State v. Greene*, 285 N.C. 482, 492, 206 S.E.2d 229, 236 (1974). If such a situation exists, the trial court's ruling as to the leading question is reviewable only for an abuse of discretion. *State v. Marlow*, 334 N.C. 273, 286-87, 432 S.E.2d 275, 282-83 (1993). Here, the prosecutor asked the leading question only after Ms. Mitchell testified that she had seen nothing else; he thus did so in an attempt to refresh her memory. Accordingly, the trial court committed no abuse of discretion by allowing the leading question. *See State v. Aiken*, 73 N.C. App. 487, 497, 326 S.E.2d 919, 925 (holding it was proper to allow two leading questions after the witness said that he had stated all he could remember), *disc. review denied*, 313 N.C. 604, 332 S.E.2d 180 (1985).

**[6]** Next, defendant contests the admission of certain testimony by Andrew Powell, another eyewitness to the shooting. Specifically, defendant objects to the following:

Q: What—what was the Defendant doing at that time?

A: Which one is you referring to now?

Q: [Defendant].

A: He was standing over him, pointing the gun still at him. And, to me, it looked like he was trying to shoot him in the head.

[Motion to strike; denied.]

(Tr. at 160.) Defendant claims this testimony amounted to an improper lay witness opinion. We disagree.

Rule 701 allows lay witnesses to offer opinions or inferences if they are (1) rationally based on the witness' own observation and (2) helpful to a clear understanding of his testimony. N.C.R. Evid. 701.

There is no question that the first prong is satisfied here. Under the second prong, a lay witness may offer an opinion if it is nothing more than a "shorthand statement of fact." *Id.*, Commentary. A "shorthand statement of fact" is simply an opinion based upon "the instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time." *State v. Spaulding*, 288 N.C. 397, 411, 219 S.E.2d 178, 187 (1975) (quoting *State v. Skeen*, 182 N.C. 844, 845, 109 S.E. 71, 72 (1921)), *death penalty vacated*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976). Allowance of opinions in the form of a "shorthand statement of fact" is premised upon the notion that a description of all the underlying detailed facts that helped to form the witness' opinion may be possible, but is not practical due to the inherent difficulties in articulating one's analytical thought processes. *State v. Loren*, 302 N.C. 607, 610-11, 276 S.E.2d 365, 367 (1981).

The witness' statement here that it looked to him like defendant was trying to shoot Mr. McCormick in the head was a permissible opinion in the form of a "shorthand statement of fact." Asking the witness to recite the precise position of Mr. McCormick, the stance of the defendant, and the angle of the gun simply would have been impractical here. *See generally State v. Eason*, 336 N.C. 730, 746-47, 445 S.E.2d 917, 927 (1994) (allowing a witness' comment that defendant "was enjoying what he was doing" as a permissible "shorthand statement of fact"), *cert. denied*, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995); *State v. Long*, 302 N.C. 607, 609-11, 276 S.E.2d 365, 367-68 (1981) (allowing witness' opinion that defendant "was acting like he was trying to hide something"); *State v. Woodard*, 102 N.C. App. 687, 695, 404 S.E.2d 6, 11 (allowing police officer's opinion that defendant "pretended" to be asleep in the patrol car), *disc. review denied*, 329 N.C. 504, 407 S.E.2d 550 (1991).

[7] In his next assignment of error, defendant contests the denial of his post-trial motion for appropriate relief. He bases his motion for appropriate relief on a mistake of law made by his trial counsel, the district attorney, and the trial judge. We conclude that the trial court properly denied his motion because the error of law resulted in no prejudice to defendant.

Prior to trial, the district attorney and defense counsel met to discuss possible pleas. As part of their discussions, they talked about the punishment for first-degree murder. Specifically, defense counsel wanted to know when the 1994 amendments to N.C.G.S. § 14-17 took

effect. Under the prior law, defendant's sentence for first-degree murder would be life; under the amendments, his sentence would be life without parole. The district attorney incorrectly read the statute and concluded that the amendment did not go into effect until 1 January 1995, after the date of the killing here. In fact, the amendment took effect 1 October 1994, prior to the killing here. At a subsequent bench conference, the trial judge agreed with the district attorney's interpretation and thus concluded that defendant's punishment if convicted would be a life sentence. Defendant was then tried, convicted, and sentenced to life imprisonment. Hours after sentencing, someone in the district attorney's office realized the mistake and pointed it out to the trial judge. The defendant was then called back into court, informed of the mistake, and re-sentenced to life without parole.

As articulated earlier, in order to receive a new trial, defendant must show that he was prejudiced by any error or mistake. N.C. Gen. Stat. § 15A-1443(a) (1999). Here, although the mistake of law occurred during plea discussions, defendant has not suggested that the mistake of law had any effect on these discussions and his decision not to take a plea. Instead, the only prejudice asserted by defendant is that, had he known his punishment would have been life without parole instead of just life, he would have put on evidence of imperfect self-defense. However, there is simply no logical relation between a mistaken understanding of eligibility for parole and the decision to argue imperfect self-defense. Imperfect self-defense, if viable, would have significantly reduced defendant's initial sentence here by changing his offense from first-degree murder (a class A felony) to voluntary manslaughter (a class D felony); it would have had no effect on his eligibility for parole. Accordingly, defendant's contention that a mistake with respect to eligibility for parole prejudiced him with respect to imperfect self-defense is without merit.

[8] Finally, defendant argues that he was deprived of effective assistance of counsel at trial, in violation of the Sixth Amendment. He alleges two indicia of ineffectiveness here: (1) defense counsel's mistaken understanding of the applicable punishment for first-degree murder; and (2) defense counsel's failure to develop a defense of imperfect self-defense.

In order to substantiate a claim for ineffective assistance of counsel, a criminal defendant must prove two prongs:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors

so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable.*"

*State v. Braswell,* 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985) (quoting *Strickland v. Washington,* 466 U.S. 668 U.S. 687, 80 L. Ed. 2d 674, 693 (1984)). In analyzing defendant's claim of ineffective assistance here, we first note that courts rarely grant relief based upon such a claim and further place upon defendant a stringent standard of proof. *State v. Sneed,* 284 N.C. 606, 613, 201 S.E.2d 867, 871 (1974). This stringent standard is required because "every practicing attorney knows that a 'hindsight' combing of a criminal record will in nearly every case reveal some possible error in judgment or disclose at least one trial tactic more attractive than those employed at trial." *Id.*

With this strict standard of proof in mind, we conclude that defendant was not constitutionally deprived of effective assistance of counsel. As to his first indicia of ineffectiveness, namely his counsel's mistaken understanding as to punishment, defendant has met neither prong of the test. Although a misreading of the statute may seem inexcusable, the fact that both the district attorney and the trial judge also misread the statute demonstrates that his counsel's errors were not constitutionally deficient. Furthermore, as we concluded earlier, the mistake did not prejudice defendant in such a way that the reliability of his trial's result was called into question.

With respect to defendant's second example of ineffectiveness, i.e., his counsel's failure to argue imperfect self-defense, we again conclude that defendant has not satisfied either requirement. The decision whether or not to develop a particular defense is a tactical decision that is part of trial strategy. Such decisions are generally not second-guessed by our courts. *State v. Lowery,* 318 N.C. 54, 68, 347 S.E.2d 729, 739 (1986). In order to substantiate a claim of imperfect self-defense, defendant would have had to show that he believed it was necessary to kill Mr. McCormick in order to save himself from death or great bodily harm. *State v. Ross,* 338 N.C. 280, 283, 449 S.E.2d 556, 559-60 (1994). He would have then needed to show that his belief was reasonable. *Id.* at 283, 449 S.E.2d at 560. Here, however, several eyewitnesses testified that Mr. McCormick was unarmed and his back was turned to defendant at the time he was shot. To develop

imperfect self-defense, defendant therefore would have had to take the stand and contradict this abundance of testimony in order to show that he feared for his life. Accordingly, we cannot question defense counsel's failure to attempt to develop imperfect self-defense. *See id.* at 283-84, 449 S.E.2d at 560 (holding that imperfect self-defense is not even available if the victim is unarmed and had his back turned to the defendant when he was shot). Furthermore, we do not see how this decision prejudiced defendant in light of the overwhelming evidence of defendant's guilt. *See State v. Attmore*, 92 N.C. App. 385, 393-94, 374 S.E.2d 649, 655 (1988) (rejecting ineffective assistance claim based on failure to put forth an insanity defense when there was overwhelming evidence both to convict defendant and to undermine the defense if it had been argued), *disc. review denied*, 324 N.C. 248, 377 S.E.2d 757 (1989).

In sum, we conclude that defendant received a fair trial, free from prejudicial error.

No prejudicial error.

Judges GREENE and EDMUNDS concur.